Mitchell E. ABOOD, Jr., Ramona L. Barnes, Robert H. Bettisworth, Charlie Bussell, John Cowdery, Milo Fritz, Walter R. Furnace, Joe L. Hayes, Vernon L. Hurlbert, John Lindauer, John J. Liska, Terry Martin, John Ringstad, Richard Shultz, Mae Tischer, and Jerry Ward, on behalf of the People of the State of Alaska, Appellants,

v.

Norman C. GORSUCH, et al., Appellees.

No. S–706.

Supreme Court of Alaska.

Aug. 2, 1985.

without regard to the merits of such transfers.

We find this point to be without merit.

James T. Robinson and David A. Devine, Smith, Robinson & Gruening, Anchorage, for appellants.

James L. Baldwin, Jonathan B. Rubini, Asst. Attys. Gen., Norman C. Gorsuch, Atty. Gen., Juneau, for appellees.

Before BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

The Speaker of the House and twenty-two other members of the Alaska House of Representatives brought this action for declaratory relief against certain state officials who, it is claimed, were not properly confirmed by the Legislature. The superior court granted summary judgment for the officials. We affirm.

### I.

The underlying facts are as follows. On May 24, 1983, the President of the Senate requested that the House attend a joint session on May 30 for the purpose of confirming officers who had been appointed by the Governor. In response, the Speaker of the House declined, but offered to meet for the same purpose on June 10. On May 30, the Senate President suggested a joint session no later than June 2. On May 31, the Speaker rejected this suggestion, noting that a number of confirmation hearings were scheduled in the House for the period between June 1 and June 4.

On June 1, the House adjourned the regular session of the legislature until January 9, 1984, and on June 2 the Speaker sent a letter to the Governor and the Senate President asserting that all executive appointments were denied confirmation by operation of law. The Senate did not concur in the House adjournment. This meant that the House recess could not last more than three days.[1] On June 3, 1983, the Governor issued a proclamation calling a joint session for 2:00 p.m. on Tuesday, June 7, 1983. The proclamation was immediately published and widely disseminated.

On June 6, the House met and again adjourned. Again, the Senate did not concur in the adjournment. On June 7, the Senate President called a joint session to order pursuant to the Governor's proclamation. In attendance were thirty-seven legislators: all twenty members of the Senate and seventeen of the forty members of the House. The joint session adjourned until June 8 with the expectation that the attendance of at least some of the missing members of the House could by then be compelled.

---

1. Art. II, § 10 of the Alaska Constitution provides: "Neither house may adjourn or recess for longer than three days unless the other concurs."

On the 8th, the Senate President again called the joint session to order. A call of the roll indicated that all Senators and twenty-one members of the House were present. At least two of the Representatives had been escorted from their offices in the state capitol to the session by state troopers acting pursuant to a request for assistance executed by the Senate President.

A roll call vote was begun on the question of confirmation of the principal department heads. Just after the voting was commenced, a call of the House was made,[2] and the session was placed at ease. At 2:14 p.m., the joint session was again called to order. A roll call vote was taken on the question of confirmation of the principal department heads. They were confirmed by thirty-eight affirmative votes. The Legislature next confirmed the Alcoholic Beverage Control Board by unanimous consent. A motion to confirm members of the State Board of Registration for Architects, Engineers and Land Surveyors followed. One Senator objected, observing that the joint session lacked a quorum from the members of the House. It was evident from the roll call vote taken on the confirmation of the principal department heads that there were then only twenty members of the House present.

A debate followed concerning the quorum necessary for the joint session. Senators Josephson and Ray argued that after the Senate and House had been convened in joint session, the Legislature became a unicameral body in which the quorum is a majority of the members of both houses. The Senate President accepted this point of view and ruled that a quorum was present. This ruling was not appealed to the joint session and the Legislature continued to confirm the remaining appointees, except for three appointees to the Board of Fisheries.

In this, the ensuing lawsuit, the plaintiffs contend that: (1) a quorum was not present at the joint session when the confirmation votes were taken; (2) the joint session was invalid because the Speaker of the House was not present; (3) the Governor's act of convening the joint session was an unconstitutional encroachment on the right of the House to investigate and hold hearings regarding the qualifications of appointees; and (4) the actions taken at the joint session were void for lack of notice required by the public meeting law.

The trial court, in a written decision following cross-motions for summary judgment, concluded that none of these claims were justiciable. The court also made alternative rulings on the merits of each of the claims, except that concerning the presence of the Speaker.

II.

We turn first to the question of justiciability. There are certain questions involving coordinate branches of the government, sometimes unhelpfully called political questions, that the judiciary will decline to adjudicate. In *Malone v. Meekins*, 650 P.2d 351, 357 (Alaska 1982), we discussed the leading federal case on justiciability, *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), stating that the Supreme Court of the United States had identified,

> various elements, one or more of which is '[p]rominent on the surface of any case held to involve a political question....' These elements included: (1) a textually demonstrable commitment of the issue to a coordinate political department; (2) the impossibility of a court's undertaking an independent resolution of the case without expressing lack of respect due coordinate branches of government; and (3) the need for adherence to a political decision already made.

*Malone* 650 P.2d at 357 (citations omitted).

In *Malone* we held that the claim that a session of the House of Representatives had been convened in violation of a statute was nonjusticiable. The statute, AS 24.10.-

---

**2.** "The purpose of a call of the house is to compel the attendance of absent members." P. Mason, *Manual of Legislative Procedure* § 190, at 167 (1979).

020,[3] related "solely to the internal organization of the legislature, a subject which has been committed by our constitution to each house." *Id.* at 356. We stated:

> For the courts to assume responsibility for overseeing the officer selection process of a legislative body would be highly intrusive and, in our opinion, inconsistent with the respect owed the legislature by the judiciary. Of significance too is the need to attribute finality to the action taken by the House. While the June 1981 reorganization did disrupt the legislative processes of the House for a few days, the important point is that the crisis passed, the House reorganized, and has since been engaged in legislative activity, all without judicial intervention. Intervention by a court at this point would be apt once again to disrupt the legislative processes of the House. Nor is it at all clear that judicial intervention during the reorganization would have shortened it or otherwise have been of benefit.

*Id.* at 357. We also held nonjusticiable a question as to whether the rules of the Legislature had been violated, noting that "we can think of few actions which would

be more intrusive into the legislative process than for a court to function as a sort of super parliamentarian to decide the varied and often obscure points of parliamentary law which may be raised in the course of a legislative day." *Id.* at 359. We explained that there could be exceptions to this "in extraordinary circumstances, as where the rights of persons who are not members of the legislature are involved...." *Id.* And we made it clear that the nonjusticiability doctrine would not apply to cases involving our "constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution, including compliance by the legislature." *Id.* at 356.

### III.

■ Article III, section 25 states that the head of each principal department of government shall be appointed by the Governor "subject to confirmation by a majority of the members of the legislature in joint session...." Section 26 provides for confirmation of members of boards and commissions in the same language as section 25.[4] What quorum is necessary for

---

**3.** AS 24.10.020 provides:

> The majority leader of each house serves as the presiding officer pro tempore of that house if the elected presiding officer resigns, becomes incapacitated, or dies. The presiding officer pro tempore is authorized to perform the duties of that office until the house elects a regular presiding officer, and the election shall be made the order of business of the house at the earliest appropriate hour.

**4.** Other actions committed to the legislature in joint session are confirmation of certain military officers of the state, art. III, § 19; approval of an extended period of martial law, art. III, § 20; disapproval of executive branch organizational changes, art. III, § 23; confirmation of the non-attorney members of the judicial council, art. IV, § 8; confirmation of the members of the Commission on Judicial Qualifications, art. IV, § 10; confirmation of the members of the University of Alaska Board of Regents, art. VII, § 3. Article II, § 16 provides that the legislature shall meet in joint session to reconsider passage of any bill vetoed by the governor. Section 16 was amended in 1976 and it now reads as follows; the amended language is underlined:

> Upon receipt of a veto message *during a regular session of the legislature,* the legislature shall meet immediately in joint session and reconsider passage of the vetoed bill or item. Bills to raise revenue and appropriation bills or items, although vetoed, become law by affirmative votes of three-fourths of the membership of the legislature. Other vetoed bills become law by affirmative vote of two-thirds of the membership of the legislature. *Bills vetoed after adjournment of the first regular session of the legislature shall be reconsidered by the legislature sitting as one body no later than the fifth day of the next regular or special session of that legislature. Bills vetoed after adjournment of the second regular session shall be reconsidered by the legislature sitting as one body no later than the fifth day of a special session of that legislature, if one is called.* The vote on reconsideration of a vetoed bill shall be entered on the journals of both houses.
>
> By contrast, the general legislative power requires "an affirmative vote of a majority of the membership of each house," art. II, § 14. Similarly, various other acts taken by the legislature require a designated vote of "each house," *e.g.* two-thirds of the membership of each house is required to provide for an effective date other

confirmation votes is a question of Alaska constitutional law. It is therefore a question to which the nonjusticiability doctrine does not apply.

Article II, section 12 of the Alaska Constitution states in part that "[a] majority of the membership of each house constitutes a quorum to do business...." Article III, section 17 provides that: "[w]henever the governor considers it in the public interest, he may convene the legislature, either house, or the two houses in joint session." The appellants argue that the quorum requirement of article II, section 12 applies to joint sessions. Consequently, no action could be taken at a joint session unless at least eleven senators and twenty-one representatives were present.

■ The trial court stated, in its alternative holding on the merits of this point:

I conclude that joint sessions of the legislature are intended to organize the legislature into a single house for authorized purposes. Confirmation sessions were made joint for the purpose of removing the check each house of the legislature has on the other. I conclude that the quorum for a joint session convened under article III, sections 25 and 26 of the Alaska Constitution is a majority of the members of the legislature, or 31 legislators from either house of the legislature. To conclude otherwise would frustrate the purpose of joint sessions.

■ We agree with the trial court. The quorum requirement set forth in article II, section 12 can only reasonably be read as applying to the business of each house, not to the business of the Legislature in joint session. In joint session, the Legislature is a unicameral body. This conclusion is in accord with the prevailing concept of what a legislative joint session is, as reflected in decisions in other jurisdictions.

In *Anderson v. Krupsak*, 40 N.Y.2d 397, 386 N.Y.S.2d 859, 353 N.E.2d 822 (1976), the question was whether a quorum was present for the election of Regents by a joint session of the Legislature of the State of New York. The New York Legislature consisted of a Senate having sixty members and an Assembly of 150 members. When the joint session acted, 148 assemblymen but only twenty-six senators were in attendance. The court held that a quorum of the joint session was a majority of all legislators, and thus that a quorum was present:

Turning to the issue of whether there was a quorum present for the election of Regents, we reject the claim that in order for there to be a quorum of the joint session there must be present a majority of the total number of Senators and also a majority of the total number of Assemblymen. Once the joint session had been convened, the Senate and Assembly were no longer separate bodies of the Legislature, but were instead merged into a unicameral body, where a quorum was simply a majority of the total membership of the unicameral body, without regard to whether those members come from the Senate or the Assembly.

386 N.Y.S.2d at 864, 353 N.E.2d at 827.

To the same effect is *Richardson v. Young*, 122 Tenn. 471, 125 S.W. 664, 680 (1910):

These conventions [joint sessions] are deliberative bodies, and, their organization and proceedings not being regulated by any statute, it would seem, like all other such bodies, they would have the power to elect their own officers, and adopt their own rules and be governed by established parliamentary usages and laws, one of which is that a majority of the members constitute a quorum to do business....

. . . . .

Joint conventions are not composed of the Senate and the House of Representatives, but of the members of the General Assembly, without regard to the house to which they were elected. The Senate,

than ninety days after an enactment, art. II, § 18; boundary changes made by the local boundary commission are effective unless dis-

approved "by a majority of the members of each house." Art. X, § 12.

while acting as a separate body, although its members number only one-third of the House, has equal power with the latter, and can reject any measure passed or proposed by it. Thus each Senator exercises in all legislation the power of three Representatives; but this power is lost in a joint convention. There they meet the members of the House upon an equality, as members of the convention; all having the same authority and only one vote.

In *Young,* the court also reviewed a decision of the United States Senate made at a time when United States senators were selected by state legislatures acting in joint session. The case, *Call v. Davidson,* arose from the State of Florida. Call received the votes of a majority of the members of the Legislature in joint session, but at the time of the vote a quorum of the Senate was absent. The Governor was of the opinion that the election was therefore invalid and appointed Davidson as Senator. The credentials of the two contestants were referred to a committee of the United States Senate which concluded that a quorum of the joint session of the Florida Legislature had been present even though a quorum of the state Senate was absent. Call was thus declared to be duly elected. 125 S.W. at 683.[5]

The unicameral nature of the Legislature when sitting in joint session is underscored by language in the 1976 amendment to article II, section 16, set forth *supra* at note 4. The subject of that article is a joint session to consider whether to override gubernatorial vetoes. The new language refers to such sessions as "the legislature sitting as one body."

 It is true, as the appellants have argued, that under the unicameral view of joint sessions, the thirty-one members of the Legislature necessary to constitute a quorum may well be thirty-one members of the House of Representatives.[6] There is nothing inherently undemocratic about this result. At a joint session, each legislator's vote is equal, notwithstanding the fact that there are twice as many representatives as senators. In view of this it would be anomalous to impose a quorum requirement under which the absence of one senator would count for more than the absence of one representative.

> [I]t is frequently the case that some or many members are absent, often for legitimate reasons, and just in proportion to their absence is the power of the minority increased. To be absent has the practical effect of voting against every bill considered in the course of the absence
>
> . . . .
>
> [T]o require more than a majority for a quorum is in effect to give the rule to the minority, instead of the majority; and thus to subvert the fundamental principle of representative government.

R. Luce, *Legislative Procedure* 47 (1922).

Appellants' argument would mean that ten senators by failing to appear at a joint session could prevent action by the other fifty legislators. This would subvert the rule of sections 25 and 26 of article III that a majority of the members of the Legislature in joint session suffices to take confirmatory action.

## IV.

Uniform Legislative Rule 51 states in part: "The president of the senate in the presence of the speaker of the house presides over joint sessions and the joint sessions are governed by the uniform rules." The Speaker of the House was absent dur-

---

**5.** *See also Wilson v. Atwood,* 270 Mich. 317, 258 N.W. 773, 774 (Mich.1935) ("The number of members elected to the House of Representatives in 1933 was 100; to the Senate, 32. The total combined membership of the two houses was, therefore, 132, and it was necessary that a majority of that number, or 67, be present in order to constitute a quorum for the 'joint convention.'")

**6.** This, of course, does not mean that meetings of a joint session of the legislature can be convened without reasonable notice of the time and place of the meeting. *See Malone v. Meekins,* 650 P.2d 351, 358 n. 14 (Alaska 1982).

ing the confirmation voting, a fact which, according to the appellants, means that the appellees were not confirmed. As noted, the trial court held this claim to be nonjusticiable finding that it arose out of "the rulemaking powers of the legislature." The trial court stated that "out of respect owed to a coordinate branch of state government, [it] defers to the wisdom of the legislature concerning violations of legislative rules which govern the internal workings of the legislature."

■ We agree with the trial court's conclusion that this claim was nonjusticiable. Our holding in *Malone v. Meekins* concerning the nonjusticiability of violations of the legislative rules is fully applicable here.

■ Appellants' attempt to distinguish *Malone* by arguing that Rule 51 is in effect a rule of constitutional law based on the bicameral nature of the Legislature. The appellants assert: "To permit a joint session to take place which is presided over only by the leader of one house would allow an unprecedented attack upon the bicameral nature of the Alaska Legislature." This argument is without merit. The Legislature is a bicameral body for some purposes and a unicameral body for others.[7] When it acts in joint session it acts as a unicameral body. The checks and balances that are present between the houses in a bicameral legislature do not exist in a unicameral setting, and it is a contradiction in terms to suggest that they do. Rule 51 is not a rule of constitutional law and its violation does not give rise to a justiciable claim.

### V.

The appellants also argue that the Governor called the joint session for the purpose of preventing the House from conducting hearings on some of the appointees. They contend that this amounts to an unconstitutional invasion of the powers and prerogatives of the House.

■ Article III, section 17 of the Alaska Constitution provides:

Whenever the governor considers it in the public interest, he may convene the legislature, either house, or the two houses in joint session.

Although each house of the legislature may conduct such inquiry as it thinks desirable into the suitability of appointees whose confirmation is required, this power does not serve as a limitation on the power of the Governor to call a joint session. The plain text of the constitution grants convening power to the executive. However, the constitution does not leave the Legislature powerless to defend its own prerogatives. While the Governor may call a joint session, his call does not determine the vote. Whether a joint session has been called prematurely is a question that can be readily decided by a majority of the legislators.

### VI.

■ Appellants' final contention is that reasonable public notice of the joint session was not given. This claim is based on the Alaska Public Meetings Act, AS 44.62.310–312. We need not consider whether this presents a justiciable controversy because it is clear that there is a constitutional requirement of reasonable notice of legislative meetings. *Malone v. Meekins,* 650 P.2d 351, 358 n. 14 (Alaska 1982).

■ It is also evident that reasonable notice was given in this case. The Governor's proclamation of June 3 called the joint session for 2:00 p.m. on June 7. The proclamation was immediately published and delivered to the clerks of each house of the Legislature, to the office of each legislator, and was disseminated by the broadcast and print news media. None of the appellants claim that they were unaware of

---

7. This fact was recognized by implication in the debates of our Constitutional Convention. One delegate objected to the insertion of the language "legislature in joint session" in the confirmation sections stating, "I believe we have adopted a bicameral legislature and we ought to operate as one." 3 Proceedings of the Alaska Constitutional Convention at 2172 (1956). His objection was rejected by the convention.

the joint session or that the notice afforded was so short that they were incapable, in fact, of attending. Although the House was not in session on June 3, it convened on June 6 and all representatives could easily have attended the session on the 7th, had they wished to do so. This is not a case where legislators are called away from their usual occupations many hundreds of miles away from the capitol without time to rearrange their work schedules or an opportunity to prepare for the subject of the session at hand.

The judgment of the superior court is AFFIRMED.

RABINOWITZ, C.J., not participating.